USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-2311 DONALD A. RUBINOVITZ, ET AL., Plaintiffs, Appellants, v. GRACE ROGATO, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Edward F. Lawson with whom Denise M. Leydon and Weston, Patrick, ________________ _________________ _________________ Willard & Redding were on brief for appellants. _________________ Thomas A. Reed with whom J. Owen Todd, Todd & Weld, John P. _______________ _____________ ____________ _______ Fitzgerald and Cogavin & Waystack, were on brief for appellees. __________ __________________ ____________________ August 1, 1995 ____________________ STAHL, Circuit Judge. Plaintiffs Donald A. and STAHL, Circuit Judge. ______________ Linda L. Rubinovitz ("the Rubinovitzes") brought this action under 42 U.S.C. 1983 and 1985 against various officials of the City of Lynn, Massachusetts (collectively, "defendants"),1 claiming a violation of their civil rights by the apparent revocation of a previously granted zoning- variance application and by the commencement of numerous code-enforcement actions against them. The district court granted defendants' motion for summary judgment. After careful review of the record, we conclude that, as to two of the defendants, summary judgment should not have been granted.  I. I. __ BACKGROUND BACKGROUND __________ The facts leading to this appeal center around property owned by the Rubinovitzes that includes an out- building containing an apartment over a one-car garage ("the property"). On January 1, 1989, the Rubinovitzes leased the apartment to Laurie A. Lussier. On the same day, they received a check for $500 from defendant Grace Rogato -- a  ____________________ 1. The defendants are city purchasing director Grace Rogato, health inspector Robert M. Barrett, gas inspector Henry P. Baron, Board of Appeals chairman John J. Burke, Jr., and Board of Appeals members Dennis Tobin and John Volo. In February 1993, Rogato died and her estate was substituted as a party in the action.  -2- 2 friend of Lussier -- to cover the first month's rent and a $100 installment toward a $300 security deposit.  Two days later, on January 3, 1989, defendant Robert M. Barrett, a code inspector for the Lynn Department of Public Health, notified the Rubinovitzes that the city required a certificate of occupancy before the dwelling could be legally inhabited. Three days later, upon a visual inspection of the apartment, Barrett advised the Rubinovitzes that city health regulations required a second means of egress before the city would issue the occupancy permit. The city building department then advised the Rubinovitzes that a zoning variance was required before they could obtain a building permit for the second means of egress. Several months later, in April 1989, the Rubinovitzes discovered that Lussier had a cat in the apartment, in violation of the lease. Acting on that violation, on April 10, 1989, the Rubinovitzes notified Lussier that her tenancy would terminate effective May 31, 1989. On April 20, 1989, Rogato went to Mr. Rubinovitz's business, an office supply store, and asked whether Rubinovitz intended to give Lussier a "hard time." Rogato further asked whether the security deposit would be returned to her. On May 2, 1989, the Rubinovitzes' application for the zoning variance came before a hearing of the Lynn Board -3- 3 of Appeals ("the Board"). By a vote of 4-1, the Board approved the variance. Two or three days later, Rogato spoke with Nancy Amenta, the clerk for the Board, and asked what had transpired as to the property at the May 2 hearing.  At some point, after Lussier occupied the apartment, defendant Barrett apparently reinspected the property. On May 4, 1989, Barrett at a meeting with Mr. Rubinovitz, presented him with an order to make various repairs within seven days. Barrett also told Rubinovitz that Rogato had been calling the health department "every hour on the hour" regarding the property and was pressuring the department to bring enforcement actions. Later that day, the Rubinovitzes wrote a letter to the director of public health, Gerald M. Carpinella (the "May 4 letter"), in which they requested a hearing on the order to repair. The letter also stated: [We] request that the type of harassment that [we] have been subjected to cease immediately, as [we] are well aware and have been informed that this stems from cronyism and blatant misuse of power and authority brought on by the Purchasing Director, Grace Rogato. Carpinella discussed the letter with Rogato. Subsequent to the May 2 variance hearing, the Rubinovitzes received two post cards from the Board notifying them that the Board had approved their request. On May 11, 1989, however, the Rubinovitzes received a letter from the Board -4- 4 notifying them that the May 2 hearing (at which their variance request had been approved) had been continued until May 16, 1989. At the continued hearing, defendant Board chairman John J. Burke, Jr., moved to reconsider the May 2 vote, and Burke and defendant Board member Dennis Tobin then reversed their earlier votes to grant the Rubinovitzes' petition. Thus, on reconsideration, the Rubinovitzes' petition failed by a 3-2 vote. On June 2, 1989, defendant Henry P. Baron, the city gas inspector, wrote to public health director Carpinella advising that gas service to the Rubinovitz apartment be discontinued because of alleged safety problems. Five days later, Carpinella wrote to the Rubinovitzes advising them of numerous violations of state plumbing and gas codes. On July 12, 1989, the city plumbing inspector, Gerald Capano, ordered the Rubinovitzes to disconnect the water and sewer connections to the apartment because they lacked requisite permits. On July 14, 1989, Baron ordered the Boston Gas Company to disconnect the gas service to the Rubinovitz apartment because of the lack of a permit. Later, Baron told a contractor hired by the Rubinovitzes to stay away from them, characterizing the Rubinovitzes as "bad people" and calling Mrs. Rubinovitz "a bitch." Meanwhile, the Rubinovitzes had appealed the Board's variance order to the Massachusetts Superior Court. -5- 5 On January 10, 1991, the Superior Court vacated the Board's reconsideration vote, thereby reinstating the Rubinovitzes' variance. The Rubinovitzes filed the present action under 42 U.S.C. 1983 against defendants alleging violation of their equal protection rights, their rights to free speech, and their property rights. The Rubinovitzes also allege violation of 42 U.S.C. 1985. Following discovery, defendants moved to dismiss. The district court treated the motion as one for summary judgment and, following a hearing, ruled from the bench that the Rubinovitzes' claims, though styled under different theories, amounted to one constitutional claim: that they were denied equal protection under the law by being singled out by Lynn officials for exercising their property rights (in evicting Lussier) and for exercising their rights to free speech (in sending the May 4 letter). The district court determined that a landlord's right to evict a tenant is "a matter uniquely grounded in state property law and does not implicate constitutional rights triggering the protections of 1983." As to free speech, the district court determined that the Rubinovitzes "failed to show any causal connection between the May 4 letter and Miss Rogato's alleged conspiratorial campaign against them." In fact, the district court said, Rogato's motivation appeared to be malice toward the -6- 6 Rubinovitzes because of their eviction proceedings against Lussier rather than retaliation for their exercise of their free speech rights. Accordingly, the district court granted summary judgment as to all counts. This appeal followed. II. II. ___ DISCUSSION DISCUSSION __________ A. Standard of Review ______________________ We review a district court's grant of summary judgment de novo, considering the facts in the light most __ ____ favorable to the nonmoving party. See, e.g., Udo v. Tomes, ___ ____ ___ _____ 54 F.3d 9, 12 (1st Cir. 1995). We resolve all reasonable inferences in that party's favor, but "we need not credit purely conclusory allegations, indulge in rank speculation, or draw improbable inferences." National Amusements, Inc. v. _________________________ Town of Dedham, 43 F.3d 731, 736 (1st Cir.), cert. denied, _______________ _____ ______ 115 S. Ct. 2247 (1995). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  B. Equal Protection ____________________ We first set out the analytical framework for our decision. The Rubinovitzes charge defendants with improper selective enforcement of lawful local regulations. See ___ -7- 7 LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), cert. _______ ________ _____ denied, 450 U.S. 959 (1981). Specifically, the Rubinovitzes ______ argue that the Board's about-face on their variance application as well as the litany of code-enforcement actions were retaliatory and singled them out for disparate treatment. As we have stated before: Liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of ________________________________________________ ________ Selectmen, 878 F.2d 16, 21 (1st Cir. 1989) (citing LeClair, _________ _______ 627 F.2d at 609-610). The Rubinovitzes argue that liability arises because: first, defendants treated them selectively; second, the selective treatment was based upon the exercise of their property and free speech rights; and third, defendants' actions constituted "malicious or bad faith intent to injure."  To facilitate the analysis of this case, we divide the events described above into two broad categories: the zoning-variance approval revocation and the code-enforcement actions. Turning first to the zoning-variance approval issue, we conclude that the Rubinovitzes have not offered a sufficient basis for us to conclude that they were -8- 8 selectively treated. Plaintiffs claiming an equal protection violation must first "identify and relate specific instances where persons situated similarly `in all relevant aspects' were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were `singled . . . out for unlawful oppression.'" Dartmouth Review v. Dartmouth _________________ _________ College, 889 F.2d 13, 19 (1st Cir. 1989) (citations omitted). _______ The Rubinovitzes neither identify others who were similarly situated, nor do they identify any instances of disparate treatment. In opposition to summary judgment, Mr. Rubinovitz's affidavit states: "there are at least [thirteen] properties in the neighborhood in which I live which have structures to the rear of the main dwelling which are used as dwelling units . . . . All of the properties are within approximately two blocks of my property." Appended to the affidavit were pictures of the property and thirteen similar structures. From this submission, the Rubinovitzes apparently ask us to infer that the Board readily granted their neighbors variance requests. However, the Rubinovitzes fail to present any evidence that any of their neighbors were either required to seek a variance or actually made such a request of the Board. Thus, there is no basis in the record by which we can determine that the Rubinovitzes were "`singled . . . out for unlawful oppression,'" id. (quoting ___ (Burt v. City of New York, 156 F.2d 791, 791 (2d Cir. 1946) ____ ________________ -9- 9 (L. Hand, J.)), or that they "suffered what others in general have escaped," Burt, 156 F.2d at 791. ____ The Rubinovitzes' complaint of selective code- enforcement actions stands on far firmer ground. For example, the Rubinovitzes point to the affidavit of city plumbing inspector Capano, in which he states that (1) he had encountered other instances where there was plumbing but no permits and (2) he did not order the plumbing disconnected, as he had with the Rubinovitzes. As to code-enforcement, we think the record contains sufficient evidence of selective treatment to forestall summary judgment. Accordingly, the balance of our analysis focuses on the defendants' code- enforcement efforts against the Rubinovitzes.  The second prong of the Yerardi's analysis requires _________ us to determine whether defendants singled out the Rubinovitzes for an improper purpose. The Rubinovitzes do not allege that the disparate treatment flowed from an invidious classification involving race or religion. Rather, the Rubinovitzes argue that defendants sought to punish them for the exercise of fundamental constitutional rights. First, although not entirely clear from their arguments below and to this court, the Rubinovitzes appear to allege that defendants punished them for exercising their "right to evict" Lussier. The Rubinovitzes rely on language from Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 53 (1st _______________ __________________ -10- 10 Cir. 1990) (quoting Board of Regents v. Roth, 408 U.S. 564, _________________ ____ 577 (1972)), holding that, in a deprivation-of-due-process analysis, protected property interests "`stem from an independent source such as state law.'" Even assuming that a right to evict a tenant would be a protected property interest under Roth for purposes of a due process claim, it ____ does not follow that there is a fundamental right to evict, the exercise of which is protected by the Equal Protection Clause. In fact, the Constitution establishes no such fundamental right. The Rubinovitzes mount another argument grounded in fundamental constitutional rights. Specifically, they allege that defendants' code-enforcement actions were an attempt to punish the Rubinovitzes for the May 4 letter. This argument also falls short, but for a different reason. Free speech is a fundamental right but, to survive summary judgment, the Rubinovitzes must offer some proof that defendants' allegedly retaliatory actions were motivated by the protected speech. See, e.g., Cloutier v. Town of Epping, 714 F.2d 1184, 1192 ___ ____ ________ _______________ (1st Cir. 1983); Packish v. McMurtrie, 697 F.2d 23, 26 (1st _______ _________ Cir. 1983). The Rubinovitzes point to ten facts that they contend constitute evidence of retaliatory motive. We are unconvinced. The Rubinovitzes adduce no direct evidence establishing retaliatory motive. Instead, they rely entirely on circumstantial evidence: that is, enforcement actions -11- 11 followed the May 4 letter. Indeed, the facts to which the Rubinovitzes point do nothing more than lay out the basic rubric of the case: e.g., the Board approved the variance on ____ May 2; Rogato contacted the Board regarding the variance after May 2; the May 4 letter was sent to Carpinella; Carpinella discussed the May 4 letter with Rogato; the Rubinovitzes received notice that the variance had been approved; on May 16, the Board reversed its decision on the variance and various code enforcement actions had been commenced against the property beginning in January 1989. This recitation is insufficient to support an inference of improper motive. As the Rubinovitzes themselves point out, the city's code-enforcement activity had been well underway for four months prior to the May 4 letter. In fact, the Rubinovitzes wrote the May 4 letter immediately following Barrett's meeting with Mr. Rubinovitz during which Barrett both presented an order to repair and related Rogato's pre- May 4 pressure to bring code-enforcement actions. The May 4 letter itself complained about the "harassment" from city officials. Although the Rubinovitzes contend that the "principal wrongful actions" took place after the May 4 letter, they offer no basis upon which to distinguish pre- and post-May 4 harassment. Of course, on summary judgment, we must draw all reasonable inferences in favor of the nonmoving party. However, those inferences "must flow -12- 12 rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability." National Amusements, 43 F.3d at 743. The record suggests ____________________ that although the city had focused its attention on the property prior to the Lussier eviction, the heightened attention began after the eviction notice but before the May 4 letter. We think the inference suggested by the Rubinovitzes rests on a "`tenuous insinuation,'" id. (quoting ___ Mesnick v. General Elec. Co., 950 F.2d 816, 820 (1st Cir. _______ __________________ 1991), cert. denied, 504 U.S. 985 (1992)), rather than an _____ ______ acceptable level of probability. Accordingly, we conclude that the record fails to support an inference that the officials' post-May 4 conduct was in retaliation for the May 4 letter.  Finally, as noted above, in the absence of invidious discrimination or the abuse of a fundamental right, a party may establish an equal protection violation with evidence of bad faith or malicious intent to injure. Yerardi's, 878 F.2d at 21; see also Yerardi's Moody St. _________ _________ _____________________ Restaurant & Lounge, Inc. v. Board of Selectmen, 932 F.2d 89, _________________________ __________________ 94 (1st Cir. 1991) (hereinafter, "Yerardi's II"). We start ____________ with two related observations. First, bad-faith or malicious-intent-to-injure cases are infrequent. Yerardi's _________ II, 932 F.2d at 94 (citing PFZ Properties, Inc. v. Rene __ _____________________ ____ -13- 13 Alberto Rodriguez, 928 F.2d 28, 33 (1st Cir. 1991) (noting in _________________ the zoning context that "[e]very appeal . . . from an adverse ruling . . . necessarily involves some claim that the board exceeded, abused or distorted its legal authority in some manner") (quotations and citations omitted), cert. dismissed, _____ _________ 503 U.S. 257 (1992)). Second, "`the malice/bad faith standard should be scrupulously met.'" Yerardi's II, 932 _____________ F.2d at 94 (quoting LeClair, 627 F.2d at 611). _______ Indeed, despite the general language of Yerardi's, _________ at least one member of this panel believes that something substantially more than a single act of malice underlying some routine administrative action is necessary to make out a constitutional claim. Cf. Esmail v. Macrane, 53 F.3d 176 ___ ______ _______ (7th Cir. 1995) (campaign of severe harassment orchestrated by mayor). But we need not resolve such issues in this case beyond cautioning that routine claims that some individual action was malicious are likely to have rough sailing. For here we think there is enough indication of a malicious orchestrated campaign causing substantial harm--though only barely enough evidence--that the case cannot be resolved on summary judgment. Although Rogato had no official authority in the matter, there is certainly evidence that she was personally hostile to the Rubinovitzes based on her resentment concerning Lussier's eviction, that she had sought to -14- 14 intervene with the Rubinovitzes personally on Lussier's behalf, that she had repeatedly pressured the health department to bring enforcement actions, that she had kept track of the Board proceedings, and that in May she had conferred with Carpinella, the public health director, not long before the cut-off orders. Rogato was an official of the city and, in a relatively small unit of government, almost certainly had access and influence beyond that of an ordinary outsider. Putting aside the Board's reconsideration vote, these actions by Rogato were followed by Baron's advice to Carpinella that gas service to the Rubinovitzes be discontinued (June 2), Carpinella's notice to the Rubinovitzes advising them of numerous violations (June 7), Capano's order to disconnect water and sewer hook-ups to the apartment (July 12), and Baron's order to Boston Gas to disconnect gas service (July 14). Baron thereafter sought to interfere with the Rubinovitzes' hiring of a contractor, using language about them ("bad people," "bitch") redolent of malice. In the case of both cut-offs, there was some ____ evidence that other residents similarly situated did not suffer the same penalty. Under these circumstances, we think that although the case might be a difficult one for the plaintiffs, a reasonable jury might well be able to conclude that there was -15- 15 an orchestrated conspiracy involving a number of officials, selective enforcement, malice, and substantial harm. Of course, the full presentation of evidence on both sides might alter this judgment and show that the plaintiffs fell just short and would be subject to a directed verdict. But at the summary judgment stage, with the obligation to draw all reasonable inferences in favor of the party opposing summary judgment, we think that this case could not be dismissed against all defendants. We think that Barrett, also named as a defendant, was properly granted summary judgment; his own investigation of code violations began well before the eviction controversy, and --while his report of Rogato's pressure is highly pertinent evidence--there is no evidence that Barrett was himself involved in either of the cut-off directives. As for Carpinella and Capano, there is no need to consider whether the evidence might be sufficient as to them, since they were not named as defendants and it is almost certainly too late in the day to consider any expansion of this lawsuit. III. III. ____ CONCLUSION CONCLUSION __________ For the foregoing reasons, the judgment of the district court is vacated as to defendants Rogato and Baron _______ and the case remanded as to them for proceedings consistent ________ -16- 16 with this opinion. As to all other defendants, the decision of the district court is affirmed. ________ -17- 17