Kadayam Srinivasan SUBASH, and Srila Sen Subash, Plaintiffs,

v.

INTERNAL REVENUE SERVICE, United States of America, Defendant.

Civ. A. No. 05–12600–NMG.

United States District Court, D. Massachusetts.

July 12, 2007.

Nathaniel J. Dorfman, U.S. Department of Justice, Tax Division, Stephen J. Turanchik, U.S. Department of Justice, Trial Attorney, Tax Division, Washington, DC, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

This is a tax refund action. The plaintiffs, Kadayam Srinivasan Subash ("Mr. Subash") and Srila Sen Subash ("Mrs. Subash"), proceeding *pro se,* move the Court to order the defendant, the Internal Revenue Service ("the IRS"), to refund to them the sum of $151,676. The IRS denies the plaintiffs' claims, relying on 26 U.S.C. §§ 421, 422 and 424. Currently pending before the Court is a motion of the IRS for summary judgment.

### I. *Background*

In 1993, Mr. Subash started working for a Massachusetts company, S.R. Research, that later changed its name to e.Credit.com, Inc. ("Ecredit"). Ecredit was a private company owned by a combination of managers and employees along with various institutional investors. Between 1993 and 2000, Mr. Subash received certain incentive stock options as part of his

employment compensation.[1] In February 2000, Internet Capital Group, Inc. ("ICG"), a public company, agreed to acquire 30% of Ecredit stock through a stock swap ("the Stock Swap") on a fully diluted basis, i.e. a 30% interest assuming all warrants, options and convertible preferred stock were exercised. Prior to the Stock Swap, ICG did not own any interest in Ecredit. Ecredit gave all of its employees the choice of accelerating the vesting of 30% of their options in order to take advantage of the Stock Swap.

After the Stock Swap, in December, 2000 and September, 2001, ICG made subsequent investments in Ecredit, increasing its share in Ecredit up to 99% at one point. Those subsequent investments, however, were made partially or fully in cash.

Mr. Subash participated in that option acceleration plan, causing 28,123 of his stock options to vest. On June 7, 2000, Mr. Subash exercised those 28,123 vested options at a total cost of $22,280 to receive 28,123 shares of common stock in Ecredit. Two days later, pursuant to Ecredit's agreement with ICG, Mr. Subash exchanged the 28,123 Ecredit shares for 14,-170 shares of ICG common stock based upon a pre-determined ratio of exchange. The purported taxable gain incurred by Mr. Subash as a result of the exchange of stock was $534,295. Accordingly, for the 2000 tax year, Mr. Subash's W-2 statement from Ecredit included, as income, that $534,195 as well as his salary of $109,283. After accounting for Mrs. Subash's salary and miscellaneous items, the plaintiffs reported $685,064 of adjusted gross income on their 2000 tax return.

In the fall of 2001, Mr. Subash learned that a local Boston accountant, Paul Cleary ("Mr. Cleary"), was preparing original and amended tax returns for other employees of Ecredit who had also participated in the Stock Swap. Mr. Cleary allegedly exempted the proceeds of the Stock Swap from taxation for those other employees. In November, 2001, Mr. and Mrs. Subash, with the assistance of Mr. Cleary, filed an amended tax return for the 2000 tax period. Mr. and Mrs. Subash also filed a Form 4852 (substitute for Form W-2) purporting to revise the W-2 statement Mr. Subash received from Ecredit to exclude $534,295 in Stock Swap proceeds. The net effect of that amended tax return was a $151,676 reduction in the federal tax liability that the plaintiffs claimed to owe.

In a letter dated June 12, 2003, an IRS Appeals Officer, Ms. Linda D. Rolfe ("Ms. Rolfe"), wrote to the plaintiffs to inform them that their amended tax return was approved. Eight weeks later, however, they were notified that Ms. Rolfe's supervisor had turned down the claim. The plaintiffs filed this Complaint on December 28, 2005, demanding that Mr. Subash's income from the Stock Swap be exempted from taxation.

## II. *Analysis*

### A. Legal Standard

Summary judgment is appropriate where the moving party has shown, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91

---

**1.** For the purposes of this motion, the IRS concedes the options were "incentive stock options" as defined in 26 U.S.C. § 422.

L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party". *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-movant's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

**B. Discussion**

**1. Internal Revenue Code Claims**

The IRS moves for summary judgment on the basis that the plaintiffs cannot prevail in their claim for a refund. It contends that Mr. Subash's income from the exercise of his incentive stock options was correctly classified as taxable income and, therefore, he cannot claim a refund.

Employers grant incentive stock options as a form of compensation. The conditions necessary to qualify as incentive stock options as well as the special rules governing their taxation are outlined in 26 U.S.C. § 422. Incentive stock options have a favored status under the Internal Revenue Code. They allow the holder to defer the recognition of income from the date the option is received to the date that it is sold and to report the income from the options as capital gain rather than ordinary income. 26 U.S.C. § 421(a)(1). In order to enjoy those tax benefits the holder of the incentive stock options must comply with the following holding requirements:

> Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock option if ... no *disposition* of such share is made by him *within 2 years from the date of the granting of the option nor within 1 year after the transfer of such share to him.*

26 U.S.C. § 422(a) (emphasis added). If the holder of the options disposes of them before satisfying the holding requirements, then he or she must report compensation income equal to the difference in value between the total exercise cost of the options and the amount realized on the disposition.

The term disposition is defined broadly in 26 U.S.C. § 424(c)(1) as "a sale, exchange, gift, or a transfer of legal title" with the following three exceptions provided in Section 424(c)(1):

> (A) a transfer from a decedent to an estate or a transfer by bequest or inheritance;
>
> (B) an exchange to which section 354, 355, 356, or 1036 (or so much of section 1031 as relates to section 1036) applies; or
>
> (C) a mere pledge or hypothecation.

The Court finds that Mr. Subash's participation in the Stock Swap is "a sale, exchange, gift, or a transfer of legal title" which does not qualify as any of the three exceptions in Section 424(c)(1).

Exceptions (A) and (C) do not apply because the options were neither transferred by bequest or inheritance, nor pledged or used as security. Although the plaintiffs allege that the Stock Swap could qualify as a reorganization under the Sec-

118

tion 354 and thus qualify under exception (B), this argument is unavailing. The Stock Swap involved the exchange of one company's stock for another's. As such, only the stock for stock reorganization, a "B Reorganization", could be applicable. A "B Reorganization" is defined as follows in Section 368(a)(1)(B):

[T]he acquisition by one corporation, in exchange solely for all or a part of its voting stock . . ., of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation. . . .

26 U.S.C. § 368(a)(1)(B). There are two components to the definition of a B Reorganization: (1) the acquiring corporation must acquire the controlling interest in the target corporation and (2) the acquiring corporation must only use its own voting stock to acquire the controlling interest in the target corporation. *Id.* Controlling interest is

at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

26 U.S.C. § 368(c).

■ The Court finds that ICG's initial purchase of Ecredit stock and the subsequent investments did not constitute a B Reorganization. In the initial purchase, the 30% of diluted Ecredit stock acquired by ICG falls short of being a controlling interest. The plaintiffs' assertion that ICG had become "the proverbial camel in the tent" is irrelevant to whether ICG acquired control of Ecredit in the statutory sense. While investments in December, 2000 and September, 2001 increased its interest in Ecredit to above 80%, those investments do not constitute a B Reorganization because they involved cash and, as such, were not "in exchange solely for all or a part of [ICG's] voting stock". As a

result, the Stock Swap was not a B Reorganization and Mr. Subash's participation in the Stock Swap does not qualify as an exception to disposition, as defined in Section 424(c)(1).

■ Having found that Mr. Subash's actions constitute a disposition, the Court also agrees with the IRS that the disposition took place before Mr. Subash satisfied the requisite holding requirements for incentive stock options. On June 7, 2000, Mr. Subash exercised 28,123 incentive stock options in Ecredit and received 28,-123 shares of Ecredit. Two days later, he swapped the Ecredit stock for ICG stock. By failing to hold the Ecredit stock for the requisite minimum of one year, the plaintiffs cannot enjoy the tax benefit associated with incentive stock options.

In his pleadings, Mr. Subash claims that abidance with that holding period requirement would have prevented him from participating in the Stock Swap. That claim is irrelevant to whether Mr. Subash was taxed correctly. Mr. Subash was required to report compensation income equal to the difference between the cost of exercising the option and the value of the stock realized as a result of the Stock Swap. As such, $534,195 was properly included in the initial tax return as taxable income and the IRS appropriately denied plaintiffs' amended tax return.

## 2. Other Claims

In addition to their tax law claims, the plaintiffs make other allegations in their Complaint. Those allegations are primarily that the IRS failed to exercise "parity and equitable treatment". The plaintiffs claim that several other Ecredit employees filed tax returns in which they listed the proceeds of the Stock Swap as exempt from taxation but were not reviewed by

the IRS nor required to pay an additional tax.

 The Court interprets that claim as an alleged violation of the Equal Protection Clause on the basis of selective enforcement. To succeed, the plaintiffs must prove that:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Rubinovitz v. Rogato*, 60 F.3d 906, 909–10 (1st Cir.1995). In the absence of such a showing, selective enforcement of a facially constitutional law or regulation does not, by itself, violate the Equal Protection Clause. *United States v. Judicial Watch, Inc.*, 371 F.3d 824, 831 (D.C.Cir.2004) (holding that in the absence of a showing of bad faith, the IRS audit of a "legal watchdog" organization did not violate the Equal Protection Clause).

Even assuming that the plaintiffs could successfully prove selective treatment, there is no showing that the selective treatment was based on impermissible discriminatory considerations or on a bad faith intent to injure the plaintiffs. Mere unequal enforcement of laws, without more, does not rise to the level of a constitutional violation. *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Penn–Field Indus., Inc. v. Commissioner*, 74 T.C. 720, 723–24, 1980 WL 4468 (1980).

The plaintiffs raise other allegations against ICG and Ecredit regarding certain details of the transactions between the two corporations. Because neither ICG nor Ecredit are named as defendants in this case, the Court declines to address those claims.

### ORDER

For the foregoing reasons, the motion of defendant IRS for summary judgment (Docket No. 13) is **ALLOWED.**

**So ordered.**