## MICHAEL KEVIN DuPONT *vs.* COMMISSIONER OF CORRECTION & others.[1]

Suffolk. September 7, 2006. - February 23, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Civil,* Summary judgment. *Practice, Criminal,* Sentence. *Imprisonment,* Department disciplinary unit. *Administrative Law,* Prison disciplinary proceeding. *Due Process of Law,* Prison regulation. *Constitutional Law,* Equal protection of laws.

In an action brought by a male inmate at a maximum security prison seeking to challenge regulations of the Department of Correction (department) governing confinement in a disciplinary unit within the prison, this court, in evaluating the inmate's claim that he was denied equal protection of the law because there was no disciplinary unit in use in State prisons housing female inmates, concluded that the inmate had no reasonable expectation of establishing that he was similarly situated to female inmates for purposes of punishment, and remanded the case to the Superior Court for entry of summary judgment in favor of the department. [398-403] MARSHALL, C.J., concurring, with whom GREANEY, J., joined.

CIVIL ACTION commenced in the Superior Court Department on September 19, 1996.

Following review by the Appeals Court, 54 Mass. App. Ct. 1107 (2002), a renewed motion for summary judgment was heard by *Elizabeth M. Fahey,* J., and a question of law was reported by her to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Julie E. Daniele (Wendy Weber* with her) for the defendants.

*Aviva E. Jeruchim* for the plaintiff.

*Martha F. Davis, Sarah R. Wunsch, Beth I.Z. Boland, Rheba Rutkowski, Cynthia M. Guizzetti, & Ellen J. Zucker,* for American Civil Liberties Union of Massachusetts & another, amici curiae, submitted a brief.

---

[1]Twenty-seven named defendants, individually and in their official capacities as employees of the Department of Correction.

CORDY, J. In 1993, while serving a twenty-year State prison sentence for armed robbery and assault at the maximum security prison, the Massachusetts Correctional Institution at Cedar Junction (MCI-Cedar Junction), Michael Kevin DuPont was found guilty by a special hearing officer[2] of a "major" violation of prison rules.[3] He was sentenced to serve eighteen months in the Department of Correction (department) departmental disciplinary unit (DDU), which is located in the same prison.[4] DuPont filed a complaint in the Superior Court raising procedural challenges to the hearing process and alleging that sentencing him to the DDU denied him equal protection of the law under, inter alia, various provisions of the Massachusetts Constitution and the Fourteenth Amendment to the United States Constitution, because there was no DDU in use for female prisoners incarcerated at what was then the only State prison for women, the Massachusetts Correctional Institution at Framingham (MCI-Framingham). In 1997, a Superior Court judge granted summary judgment for the defendants on all claims.

With respect to DuPont's equal protection claim, the judge concluded that he had "failed to make the threshold showing that he is similarly situated to female inmates in [MCI-] Framingham." DuPont appealed. In a memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed summary judgment on all counts except the equal protection claim. *DuPont* v. *Commissioner of Correction*, 54 Mass. App. Ct. 1107 (2002). On that claim, the Appeals Court set aside summary judgment "[f]or all the reasons set forth in" *Todd* v. *Commissioner of Correction*, 54 Mass. App. Ct. 31 (2002), and remanded the case to the Superior Court. In the *Todd* case, the

[2]A special hearing officer is a hearing officer appointed by the Commissioner of Correction (commissioner) to conduct disciplinary hearings in cases involving "major" violations where a sentence to the departmental disciplinary unit (DDU) may be warranted. See 103 Code Mass. Regs. §§ 430.06-430.09 (1995).

[3]The specific violations are not enumerated in the record, but the incident from which they arose involved DuPont's refusal to allow another inmate (prison barber) to be taken from his (DuPont's) cell, and blocking the efforts of the guards to place DuPont into restraints. The resulting altercation required the use of an extraction team that disrupted the unit.

[4]DuPont eventually served fifty-five months in the DDU. The reasons for this extended sentence in the DDU are not in the record.

inmate raised a similar equal protection challenge to the use of the DDU for male but not female prisoners incarcerated in State prisons. Summary judgment for the State defendants was vacated by the Appeals Court because, while "defer[ring] to the department as to its purposes in promulgating and applying the regulations governing confinement to the DDU," the department had failed to furnish materials "indicating why the regulations here, which are facially neutral, do not apply to female prisoners." *Id.* at 38.

On remand in the present case, a different Superior Court judge denied the defendants' renewed motion for summary judgment. That motion was based principally on an affidavit of the Commissioner of Correction (commissioner) that attempted to address the record deficiencies noted by the *Todd* court. In denying the defendants' motion, the judge "accept[ed] that the Appeals Court implicitly found valid DuPont's argument that male and female prisoners are similarly situated." She then applied a strict scrutiny analysis in evaluating DuPont's equal protection claim, and concluded that questions of fact "remain[ed] as to whether [male inmates] are, in fact, more violent than [female] and thus require more stringent punishment so as to promote safety in the correctional system."

After denying the defendants' motion, the Superior Court judge, pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), reported the correctness of her ruling and the following question: "Should prison regulations, contested on an 'as applied' basis by individual inmates as violating equal protection rights based on a suspect classification such as gender, be considered through the lens of rational basis scrutiny or by the more rigorous strict scrutiny analysis?" We transferred the case from the Appeals Court on our own motion. Based on the expanded record before us, we conclude that while strict scrutiny would likely be the proper standard to apply to gender-based classifications in the prison context, DuPont has not established that he is similarly situated to female inmates at MCI-Framingham for purposes of punishment, and enter summary judgment for the defendants.[5]

1. *Background.* The following description of the State prison

---

[5]We acknowledge the amicus brief filed by the American Civil Liberties

system and the operation of the DDU are drawn from the undisputed facts in the record, including the statutory and regulatory framework by which they are governed.

a. *The department disciplinary unit.* The DDU is a restricted area to which an inmate may be sentenced by a special hearing officer. 103 Code Mass. Regs. § 430.06 (1995). There is only one DDU in the correctional system. It is located at MCI-Cedar Junction, one of two maximum security prisons run by the department. The purpose and use of the DDU is to house inmates "engaging in the most violent, predatory and repetitive kind of disciplinary conduct" in the correctional institutions in Massachusetts.[6] A sentence to the DDU serves as punishment for disciplinary or criminal behavior engaged in by such inmates during their incarceration and, importantly, removes them from the general population, providing a safer environment for other inmates, correctional staff, and the public.[7]

Inmates can be sentenced to the DDU only after a disciplinary officer finds that such a sentence may be warranted and forwards a copy of the disciplinary report to a special hearing officer, the

Union of Massachusetts and the Women's Bar Association.

[6]DuPont contends that this purpose, as set forth in the commissioner's affidavit, is inconsistent with deposition testimony the commissioner gave in 1995 in connection with a case challenging the constitutionality of the procedures and use of a DDU for any prisoner. His testimony on this point was brief and in response to questions regarding discussions he had with his predecessor (before the DDU was established) about the need for a DDU over and above the department's segregation units (DSUs), which exist in all of the department's prisons, including the Massachusetts Correctional Institution at Framingham (MCI-Framingham). In essence, his testimony was that in his experience the use of the DSUs was inadequate to deal with prisoners who continued to engage in acts of violence and prison disruption, even after being released from the DSU. He also testified that his predecessor (a former Federal Bureau of Prisons official) told him that the use of a DDU at a Federal prison at Marion, Illinois, had been effective in deterring both violent and disruptive behavior. This testimony is not materially inconsistent with Maloney's affidavit prepared more than a decade after the DDU became operational.

[7]For the first thirty days, inmates in the DDU have no access to a telephone or radio and are not permitted visitors. *McGuinness* v. *Dubois*, 891 F. Supp. 25, 28 (D. Mass. 1995). They may then earn these privileges through good behavior. *Id.* DDU inmates have one-hour exercise periods five days per week. *Id.* To receive credit for time served while in the DDU, an inmate must attend a monthly review. 103 Code Mass. Regs. § 430.25 (1995). An inmate may be sentenced to the DDU for a term not exceeding ten years. *Id.*

prisoner is notified of the possibility of a DDU sentence, and a hearing is held. 103 Code Mass. Regs. §§ 430.08, 430.09, 430.11 (1995).[8] Typically, offenses "involving little or no threat to the well being of others, to property, or to the security of the institution" are not eligible for a DDU sentence. 103 Code Mass. Regs. § 430.09. When determining whether a particular offense warrants a DDU sentence, the disciplinary officer is to consider whether it constitutes a "[t]hreat to institutional security," "[r]epetitiveness," the "[e]xtent of harm done," and any "[m]itigating circumstances."[9] *Id.*

Inmates housed in any correctional institution under the control of the department may be sentenced and transferred to the DDU at MCI-Cedar Junction, although approximately seventy-five per cent of those sentenced were incarcerated at MCI-Cedar Junction at the time they committed their offenses.[10] The DDU's regulations governing its use are gender neutral on their face, and could be applied to both male and female prisoners.

b. *Prison demographics.* In Massachusetts, by statute, male and female prisoners are housed separately. G. L. c. 127, § 22 ("Male and female prisoners shall not be put or kept in the

---

[8]For a more thorough summary of the regulations setting forth this procedure, see *Todd* v. *Commissioner of Correction*, 54 Mass. App. Ct. 31, 36-37 (2002). The use of the DDU for the purposes of punishment and security was ruled constitutional by this court in *Torres* v. *Commissioner of Correction*, 427 Mass. 611, 615, 616, cert. denied, 525 U.S. 1017 (1998), as were the procedures attendant to DDU confinement. *Id.* at 617-619.

[9]DuPont asserts that inmates have been sentenced to the DDU for nonviolent offenses and provided affidavits from two prisoners confined at the Massachusetts Correctional Institution at Cedar Junction (MCI-Cedar Junction) who claim to have been sentenced to the DDU for such offenses. The commissioner seeks a remand for an evidentiary hearing on these claims if the court finds it necessary to its decision. We decline to do so. That two inmates were sentenced for "nonviolent" offenses tells us little about the seriousness of those offenses and whether they involved a threat to institutional security. What may seem to be a minor matter in an environment far removed from the confines of a maximum security prison may strike the match of conflagration within its walls. Such determinations are properly reserved to the judgment of prison officials, provided they comply with procedures satisfying due process (a claim not before us).

[10]This figure comes from the plaintiff's statement of uncontested facts. The record is silent as to where the remainder of the DDU population might come from at any given time.

same room in a jail or house of correction . . .").[11] Notwithstanding their gender, persons convicted of crimes and sentenced to imprisonment receive a sentence either to a county house of correction (run by the county sheriffs) or to State prison (run by the department). Sentences to a house of correction are almost always of shorter duration than sentences to State prison, see G. L. c. 279, § 23 ("No sentence of . . . imprisonment or confinement for more than two and one half years shall be executed in any jail or house of correction"); see also G. L. c. 279, § 19, and are imposed only for misdemeanors or for less serious felonies.[12] State prison sentences, on the other hand, are meted out only in cases of felony convictions and often involve serious crimes of violence that do not permit the imposition of a lesser sentence to a house of correction.[13] Not surprisingly, the challenges of safely managing an inmate population

---

[11]DuPont does not argue that this separation of prisoners based on sex is a violation of the equal protection clause, and it seems "beyond controversy that [they] may lawfully be segregated into separate institutions within a prison system." *Klinger* v. *Department of Corrections*, 107 F.3d 609, 615 (8th Cir. 1997). See *Women Prisoners of the D.C. Dep't of Corrections* v. *District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996), cert. denied, 520 U.S. 1196 (1997).

[12]Many lesser felony offenses provide for alternative sentences to either a house of correction or State prison, depending on the seriousness of the crime and the offender's criminal background. See, e.g., G. L. c. 265, § 15A (punishment for assault and battery by means of dangerous weapon is imprisonment in a State prison for not more than ten years or house of correction for not more than two and one-half years); G. L. c. 265, § 15B (punishment for assault by means of dangerous weapon is imprisonment in a State prison for not more than five years or house of correction for not more than two and one-half years); G. L. c. 266, §§ 16, 17, 18 (punishment for breaking and entering is imprisonment in a State prison for not more than five, ten, or twenty years based on time of entry, intent at time of entry, and other factors, or imprisonment in a house of correction for not more than two and one-half years); G. L. c. 266, § 30 (punishment for larceny where value of stolen property exceeds $250 is imprisonment in State prison for not more than five years or jail for not more than two years); G. L. c. 266, § 49 (punishment for possession of burglar tools with intent to commit a crime is imprisonment in a State prison for not more than ten years or jail for not more than two and one-half years).

[13]See, e.g., G. L. c. 265, §§ 1, 2 (punishment for murder is imprisonment in State prison for life); G. L. c. 265, §§ 22, 22A (punishment for rape of adult or child is imprisonment in State prison for up to life); G. L. c. 265, §§ 18A, 18C (punishment for armed assault in a dwelling and armed home invasion is imprisonment in State prison for at least ten or twenty years, respectively); G. L. c. 265, § 26 (punishment for kidnapping while armed with a dangerous

serving shorter sentences for less serious crimes in the county houses of correction differ from those faced by the department in managing the population of prisoners incarcerated in State prisons. Not all county houses of correction, however, have facilities for women prisoners. Consequently, women imprisoned for crimes that might ordinarily be punished by incarceration in a county house of correction are often committed to the custody of the department and imprisoned at MCI-Framingham. G. L. c. 279, § 16 ("A female, convicted of a crime punishable by imprisonment in a jail or house of correction, may be sentenced to the Massachusetts Correctional Institution, Framingham"). Until recently, MCI-Framingham was the only State prison for women.[14] Thus, females convicted and sentenced for crimes ranging from life felonies to misdemeanors may serve their sentences at MCI-Framingham, a medium security prison.

Between 1994 and 2002, the number of males serving State prison sentences in the department's facilities averaged approximately 9,500.[15] Two of those facilities are maximum security prisons. During this same period, the number of females incarcerated at MCI-Framingham averaged approximately 590. Only about one-half of these female inmates, however, were serving State prison sentences. The remaining one-half were awaiting trial or were serving house of correction sentences. Consequently, a larger percentage of the State's male prisoners

weapon and inflicting serious bodily injury or sexual assault is imprisonment in State prison for not less than twenty-five years); G. L. c. 265, § 17 (punishment for armed robbery is imprisonment in State prison for up to life); G. L. c. 265, § 18 (*b*) (punishment for assault with intent to rob or murder while armed with a dangerous weapon is imprisonment in State prison for up to twenty years); G. L. c. 265, § 21 (punishment for confining a person for the purpose of stealing is imprisonment in State prison for up to life).

[14]In 2002, the department designated South Middlesex Correctional Center as a minimum security female prison for prerelease inmates. There is little in the record about the operation of this prison, but there is nothing that suggests that the opening of this facility has altered the variety of security classifications housed at MCI-Framingham, the types of crimes committed by female inmates, the length of sentences being served, or the acts of violence engaged in at MCI-Framingham.

[15]There are fifteen prison facilities under the department's control that house male prisoners. MCI-Cedar Junction and the Souza-Baranowski Correctional Center are classified as maximum security facilities, nine are classified as medium security, and four others are classified as minimum security.

were serving sentences for violent offenses than the women prisoners incarcerated at MCI-Framingham. For example, in 2001, sixty-seven per cent of the male prisoners and thirty-seven per cent of the female prisoners were serving sentences for such crimes. Similarly, the percentage of males sentenced to State prison each year for violent offenses far exceeds the percentage of females sentenced to MCI-Framingham for similar crimes. For example, in 2000, fifty per cent of the males, and only nineteen per cent of female prisoners, were sentenced for such offenses.

c. *Safety and security of the institutions.* In State prisons housing male prisoners, there were twenty-two major riots or disturbances and at least four murders between 1993 and 2003.[16] During this same period, there was none of either at MCI-Framingham. Correction officers were attacked by prisoners wielding weapons on ninety-three occasions during the period 1994 through 2002. Only one of these attacks occurred at MCI-Framingham.

In addition, a substantial number of male prisoners are involved in prison gangs and gang violence. These gang members have caused a number of the large scale disturbances during which many prisoners have been injured, and correction officers have had to fire their weapons to restore order.[17] Violence committed by prison gangs in the 1990's led directly to policy and operational changes within the male prisons, and new regulations aimed at exercising control over them, including transferring gang leaders to MCI-Cedar Junction, where the DDU is located.[18] While there is the presence of a single gang at MCI-Framingham, its members have not engaged in violence.

d. *The use of the DDU.* The commissioner has determined that the use of a DDU is necessary to the safe, secure, and orderly management of the male prison population in the

---

[16]During the 1970's, prior to the establishment of the DDU, there were twenty-five murders at MCI-Cedar Junction.

[17]The gravity of gang violence in prisons and the danger it poses to inmates and correctional staff cannot be overlooked. See *Johnson* v. *California*, 543 U.S. 499, 532 (2005) (Thomas, J., dissenting) ("Controlling prison gangs is the central challenge facing correctional officers and administrators").

[18]These changes also included a policy to identify gang members and forbidding transfer of those members below medium security facilities.

department's custody, and not necessary to the safe, secure, and orderly management of the female prisoners at MCI-Framingham. As set forth in detail in his affidavit, this determination is based on the significant differences in prison demographics; the significant differences in the level and type of violence that threaten the security of the department's prisons, staff, and inmates; and decades of experience in managing the populations of the department's facilities, including MCI-Framingham.[19]

The commissioner has also averred that, while the use of a DDU to remove violent, predatory, and repeatedly disruptive prisoners from the general population is not presently necessary to the safe, secure, and orderly operation of MCI-Framingham,[20] should the need arise, he could proceed to establish a unit comparable to the DDU at the prison and use it for female prisoners who pose a danger to the safety and security of the institution.[21]

2. *Discussion*. a. *Standard of review*. Summary judgment is to be rendered if the pleadings and other discovery along with affidavits illustrate that "there is no genuine issue as to any material fact." Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). A party moving for summary judgment in a case in which the opposing party has the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to pleadings, other discovery, or affidavits, "unmet by countervailing materi-

---

[19]One of the many factors on which the commissioner's determination is based is the extent and nature of violence between inmates. The statistics regarding inmate-on-inmate assaults appended to the commissioner's affidavit, if viewed in proportion to the size of the different populations, suggest there are proportionately as many (if not more) female prisoners at MCI-Framingham engaged in this type of assaultive behavior as their male counterparts. The commissioner avers that if examined individually, the instances of inmate-on-inmate assaultive behavior are less serious at MCI-Framingham. In any event, the material question is the threat that prisoner misconduct has on the safe and secure operation of the institution.

[20]Male and female inmates alike are subject to a number of other disciplinary measures and sanctions for prison misconduct, including periods of segregation in the DSUs, present in all of the department's prison facilities.

[21]At oral argument, it was conceded that in instances where a female prisoner has posed a significant danger to the safe, secure, and orderly operation of MCI-Framingham, the prisoner has been transferred to a higher security prison in another State. This remedy, according to the commissioner, has proved adequate in the few instances where it was found to be necessary.

als, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

b. *The necessity of a DDU.* It is the duty of the commissioner to "maintain security, safety and order at all state correctional facilities . . . , [to] take all necessary precautions to prevent the occurrence or spread of any disorder, riot or insurrection at any such facility . . . , and [to] take suitable measures for the restoration of order." G. L. c. 124, § 1 (*b*). The commissioner's determination that the use of a DDU is necessary to the safe, secure, and orderly operation of some prisons, but not others, is the type of determination "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security] considerations, courts should ordinarily defer to their expert judgment in such matters." *Turner* v. *Safley*, 482 U.S. 78, 86 (1987), quoting *Pell* v. *Procunier*, 417 U.S. 817, 827 (1974).

In view of the level of deference owed to the commissioner's determination, the substantial evidence in the record supporting it, and the dearth of evidence in the record that suggests that security considerations have been exaggerated, it is apparent that DuPont will be unable to establish either that the use of the DDU is not necessary to the safe, secure, and orderly operation of the State institutions housing male prisoners or that its use is similarly necessary to the safe, secure, and orderly operation of MCI-Framingham. He argues, however, that he has been denied his right to the equal protection of the laws because the commissioner has chosen selectively to utilize the DDU regulation in prisons housing male prisoners (specifically in the maximum security prison where he was incarcerated) and not in the prisons housing female prisoners (specifically in the medium security prison where women are incarcerated).

c. *Equal protection.* "Liability in an equal protection case where the defendants have been charged with improper selective enforcement of a statutory or regulatory scheme 'should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such

selective treatment was based on impermissible considerations such as race, religion, [gender], intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Cote-Whitacre* v. *Department of Pub. Health,* 446 Mass. 350, 376 (2006), quoting *Rubinovitz* v. *Rogato,* 60 F.3d 906, 909-910 (1st Cir. 1995). "Plaintiffs who claim an equal protection violation must 'identify and relate specific instances where persons situated similarly "in all relevant aspects" were treated differently . . . .' " *Cote-Whitacre* v. *Department of Pub. Health, supra,* quoting *Rubinovitz* v. *Rogato, supra* at 910.

If DuPont establishes that he was similarly situated to female prisoners at MCI-Framingham and that the selective utilization of the DDU regulation against him was based on his gender, then the commissioner would be required adequately to justify the differential treatment using either of two accepted tests. Under the United States Constitution, the adequacy of the justification likely would be assessed using the rational basis test. See *Johnson* v. *California,* 543 U.S. 499, 509-510 (2005). Under the Massachusetts Constitution, however, where gender is an impermissible consideration, a higher, or strict scrutiny test likely would be applied.[22] *Commonwealth* v. *King,* 374 Mass. 5, 21 (1977) (under Massachusetts Constitution, sex-based classifications "subject to strict judicial scrutiny"). Cf. *Johnson* v. *California, supra* (strict scrutiny applied to impermissible consideration of race in housing prisoners). There is little doubt on the record in this case that the commissioner's decision regarding the utilization of the DDU would survive application of the rational basis test. We need not decide whether it would survive the application of the strict scrutiny test because we conclude that DuPont has not met the similarity prerequisite for bringing an equal protection claim.

An equal protection claim can only succeed if a plaintiff establishes that government action discriminates against similarly situated persons. *Matter of Corliss,* 424 Mass. 1005,

---

[22]The Massachusetts Constitution provides: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." Art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments.

1006 (1997). *Rubinovitz* v. *Rogato, supra* at 909-910. The "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Women Prisoners of the D.C. Dep't of Corrections* v. *District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996), cert. denied, 520 U.S. 1196 (1997) (*Women Prisoners*), quoting *Klinger* v. *Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995). Whether two groups of persons are similarly situated is not easily ascertained. "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . [T]he 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary . . . ." *Barrington Cove Ltd. Partnership* v. *Rhode Island Hous. & Mtge. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001), quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989).

The premise of DuPont's argument that he is similarly situated to female inmates at MCI-Framingham is essentially that all inmates facing discipline for similar acts are similarly situated. Acceptance of this premise would ignore the very real differences between prisons housing men and those housing women within the Massachusetts prison system: most importantly, the elevated level of volatility present in male prisons, as reflected in the violent makeup of their populations and amount of institutionally threatening violence that occurs there. Similar acts committed in such dissimilar environments have far different consequences.

Typically, when courts examine whether male and female inmates are similarly situated for purposes of an equal protection claim, they look to considerations such as the makeup of the prison populations, security levels, types of crimes committed, length of sentences imposed, and history of violence within the prisons. See *Keevan* v. *Smith*, 100 F.3d 644, 648-650 (8th Cir. 1996) (considering number of male and female inmates, average duration of sentences served by males and females, number of inmates of each sex assigned highest security classification, and crimes committed by male and female inmates); *Women Prisoners, supra* at 925-926; *Timm* v. *Gunter*, 917 F.2d

1093, 1103 (8th Cir. 1990), cert. denied, 501 U.S. 1209 (1991) (considering number and age of inmates, types of crimes committed, length of sentences, and frequency of incidents involving violence); *Pargo* v. *Elliott*, 894 F. Supp. 1243, 1261 (S.D. Iowa), aff'd, 69 F.3d 280 (8th Cir. 1995), cert. denied, 519 U.S. 831 (1996), quoting *Klinger* v. *Department of Corrections*, 31 F.2d 727, 731-732 (8th Cir. 1994) (considering different housing schemes for male and female inmates, average time served by male and female inmates, and special characteristics of female inmates such as the higher percentage of single parents and history of suffering sexual or physical abuse and the contrary characteristic that male inmates are "more likely to be violent and predatory").

Courts that have considered the issue have concluded that male and female prisoners are often not similarly situated in relevant respects for purposes of asserting equal protection claims. See *Klinger* v. *Department of Corrections*, 107 F.3d 609, 612 (8th Cir. 1997) (male prisoners housed in multiple institutions and female prisoners housed in one not similarly situated for purposes of access to programs and services based on differences in prison demographics); *Keevan* v. *Smith, supra* (male and female inmates not similarly situated for purposes of prison programming based on different number of male and female inmates, differences in sentences served, and classification levels of male and female inmates); *Women Prisoners, supra* at 924-927 (male and female inmates housed in separate prisons not similarly situated for purposes of access to programs and services); *Timm* v. *Gunter, supra* (male and female inmates not similarly situated for purposes of pat-down searches by opposite sex guards); *Pargo* v. *Elliott, supra* (male and female inmates not similarly situated for purposes of inmate security and programming where male inmates housed in different facilities by security classifications and female inmates housed together, served shorter sentences, and had special characteristics); *State* v. *Emery*, 357 A.2d 878 (Me. 1976) (male and female prisoners not similarly situated for determining punishment for escape based on different security measures applicable to male

and female facilities).[23] Contra *Pitts* v. *Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989) (male and female inmates convicted of non-Federal crimes similarly situated for purposes of determining whether the locations of their prisons violated equal protection, where female prison far removed from families); *Glover* v. *Johnson*, 35 F. Supp. 2d 1010, 1015 (E.D. Mich. 1999) (summarily finding male and female inmates similarly situated for purposes of educational and vocational programming). Massachusetts courts have not addressed the question either in general or in the context of prison security.

Considering the significant differences between the State's male and, in this case, its maximum security prison population, and the population of female prisoners at MCI-Framingham that are pertinent to prison security and safety, we conclude that DuPont has no reasonable expectation of establishing that he and female prisoners are similarly situated for purposes of applying measures directed at punishing and removing the most predatory and dangerous prisoners from the general population. Female prisoners of all security levels are housed at the medium security MCI-Framingham facility, while males are housed separately based on security classifications, with at least seventy-five per cent of those subjected to the DDU, coming from the maximum security population; female inmates, on average, serve shorter sentences than male inmates housed by the department; a significant majority of male inmates are serving sentences for violent crimes while a minority of the inmates at MCI-Framingham are serving such sentences; and inmates in prisons housing male prisoners have engaged in significantly more institutionally threatening behavior than female inmates

---

[23]The judge who originally granted summary judgment for the defendants found *State* v. *Emery*, 357 A.2d 878 (Me. 1976), to be the closest case to the one at bar. The facts of the case were that female prisoners could receive a maximum five-year sentence for escaping from the Women's Correctional Center (where women serving both State prison sentences and others were incarcerated), while male prisoners, incarcerated in the State prison, could be sentenced up to a maximum of ten years for escape from that institution. The Supreme Judicial Court of Maine concluded that the statutory prison scheme provided for heavier security at the State prison than at the Women's Correctional Center, and therefore male and female prisoners were not similarly situated "[f]or purposes of prosecution for escape from the respective institutions . . . ." *Id.* at 880.

over many years, in the form of riots, gang violence, and armed assaults on correction officers.[24]

3. *Conclusion.* Where DuPont is not similarly situated to female prisoners imprisoned at MCI-Framingham for the purpose of punishment under the DDU regulation, summary judgment should have been entered for the defendants. The case is remanded to the Superior Court for that purpose.

*So ordered.*

MARSHALL, C.J. (concurring, with whom Greaney, J., joins). I agree that DuPont's claims are properly dismissed, but for reasons that differ from those of the court. Strict scrutiny applies to DuPont's gender-based equal protection claim under the Massachusetts Constitution.[1] See art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments; *Commonwealth* v. *King*, 374 Mass. 5, 21 (1977). I write separately because, contrary to the court's conclusion, *ante* at 399-403, in my judgment the Department of Correction (department) has failed to establish that for purposes of serious disciplinary sanctions (the critical focus here), male and female prisoners found to have committed "major" incidents are not "similarly situated." See *Barrington Cove Ltd. Partnership* v.

---

[24]We are cognizant that the requirement that parties be similarly situated as a prerequisite to an equal protection claim can be conflated with the application of the ultimate test, i.e., the parties' dissimilar situations provide the bases for treating them differently. See *Walker* v. *Exeter Region Coop. Sch. Dist.*, 284 F.3d 42, 44 (1st Cir. 2002) ("Decisions may sometimes use the similarly situated language to conflate the two inquiries [similar situation and rational basis] — by pointing to a differentiating characteristic so self-evidently a basis for a reasonable classification as to show both dissimilarity and reasonableness at the same time"); *Yates* v. *Stalder*, 217 F.3d 332, 335 (5th Cir. 2000) ("If legitimate penalogical goals can rationally be deemed to support the decision to treat male and female prisoners differently, then they are not similarly situated for Equal Protection purposes"). On the other hand, while the similarly situated requirement and the standard of review may rely on some of the same facts, circumstances and population characteristics, they are analytically separate. In this case, we have no trouble concluding that the situations are dissimilar in all relevant respects, and that DuPont has not met his burden on this prerequisite to his claim.

[1]The court notes that strict scrutiny "would likely be the proper standard to apply to gender-based classifications in the prison context." *Ante* at 391.

*Rhode Island Hous. & Mtge. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (test is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated").

A prisoner who is found by a hearing officer to have incited a riot, killed another prisoner, tampered with prison locks, possessed a gun, or taken hostages has committed a "major" disciplinary infraction. See 103 Code Mass. Regs. §§ 430.09, 430.24(7), (14), (15), (16) (1995). Neither the number of other prisoners residing in the disciplinary offender's institution at the time of the incident nor the underlying crime that caused the offender's (or other prisoner's) incarceration are relevant to whether discipline is warranted; the inmate's actions pose dangers of such gravity that the Commissioner of Correction (commissioner) has identified them as meriting "[m]ajor sanctions." See 103 Code Mass. Regs. § 430.25(3) (1995).[2] "Major" disciplinary offenses always involve a threat to the well-being of others and a threat to the security of the prison in which the person is incarcerated.[3] The question here is not whether prison security is jeopardized by such offenses but whether the admittedly starkly different discipline of individual male and female prisoners who commit such "major" disciplinary offenses is permissible.[4] Cf. *Pitts* v. *Thornburgh*, 866 F.2d 1450 (D.C Cir. 1989) (male and female prisoners "similarly situated" for purposes of determining whether the locations of

---

[2]See also 103 Code Mass. Regs. § 430.09(4) (1995) ("In designating the offense as a minor or major matter, the disciplinary officer may consider the following factors: (a) Threat to institutional security; (b) Repetitiveness; (c) Extent of harm done; and (d) Mitigating circumstances").

[3]See 103 Code Mass. Regs. § 430.09(5) (1995) ("Cases involving little or no threat to the well being of others, to property, or to the security of the institution shall ordinarily but not necessarily be designated as minor matters").

[4]In his forty-six page handwritten complaint, which was not included in the record on appeal, DuPont alleges, among other things, that he was consigned to the department disciplinary unit (DDU) on charges of having violated an unwritten prison policy limiting haircuts to fifteen minutes, a "minor" incident in any case. He also alleges that assignment to the DDU was in retaliation for prior litigation he had filed against the department. DuPont also asserts that, while confined in the DDU, he was in "[i]solation for over 2½ years with no personal property, no tv, no radio, no incoming mail stamps, no personal visits, no telephone calls, no canteen, no programs . . . ."

their respective prisons violated equal protection); *Glover* v. *Johnson*, 478 F. Supp. 1075, 1077-1078 (E.D. Mich. 1979) (male and female prisoners "similarly situated" for purposes of educational programs).

It is instructive that none of the cases relied on by the court to reach the conclusion that for purposes of discipline male and female prisoners are *not* similarly situated, see *ante* at 401-402, deals with the type of disciplinary sanctions at the root of Du-Pont's equal protection claim.[5] In addition, in every case relied on by the court — all (but one) Federal cases applying Federal law — the courts were not required to subject the gender-based claims to strict scrutiny, as we are required to do under Massachusetts law. See *Commonwealth* v. *King, supra.* Moreover, the cases cited by the court rely principally on the highly deferential, rational basis rationale of *Turner* v. *Safley*, 482 U.S. 78 (1987), which was explicitly rejected by the Court in *Johnson*

---

[5]See *Oliver* v. *Scott*, 276 F.3d 736, 743-746 (5th Cir. 2002) (policy of permitting female guards to strip search male inmates and monitor them in showers; lack of partitions in male but not female prison bathrooms); *Keevan* v. *Smith*, 100 F.3d 644, 647-651 (8th Cir. 1996) (prison demographics justify offering fewer educational and job-training programs for female prisoners than male prisoners); *Women Prisoners of D.C. Dep't of Corrections* v. *District of Columbia*, 93 F.3d 910, 923-927 (D.C. Cir. 1996), cert. denied, 520 U.S. 1196 (1997) (rejecting program-by-program comparisons of vocational and other programs in male-only and female-only prisons because, inter alia, women's prisons were smaller and contained programs not available in men's prisons, and inmates have no constitutional rights to work and educational opportunities); *Klinger* v. *Department of Corrections*, 31 F.3d 727, 731-734 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995) (differences in prison programs and services between men's and women's prisons permitted in light of different attributes of respective prisons and broad discretion permitted prison officials); *Timm* v. *Gunter*, 917 F.2d 1093, 1098-1099 (8th Cir. 1990), cert. denied, 501 U.S. 1209 (1991) (opposite-sex surveillance and pat searches of male inmates justified, in part, by need for optimum uses of security resources and the superior rights of female prison guards to equal employment opportunity); *Pargo* v. *Elliott*, 894 F. Supp. 1243, 1263 (S.D. Iowa), aff'd, 69 F.3d 280 (8th Cir. 1995), cert. denied, 519 U.S. 831 (1996) (finding, inter alia, heightened analysis inapplicable to claims of disparities in programs and services between men's and women's prisons).

The only case that bears any factual similarity to this case is *State* v. *Emery*, 357 A.2d 878 (Me. 1976). There, the Supreme Judicial Court of Maine determined that, for purposes of punishing prison escape attempts, male and female inmates were not similarly situated. However, the opinion turned on legislative distinctions between "inmates" and "prisoners" and between State prisons and the women's correctional center. See *id.* at 880.

*v. California*, 543 U.S. 499, 509-511 (2005), as inapplicable to equal protection challenges to prison regulations that require heightened scrutiny. See note 6, *infra*. Because in Massachusetts sex-based classification is, like race-based classification under Federal law, subject to strict scrutiny, it is "immediately suspect," *id*. at 509, and because the regulation at issue is a particularly harsh deprivation of liberty, see *O'Malley* v. *Sheriff of Worcester County*, 415 Mass. 132, 139 (1993), the high deference to prison officials and reliance on generalized demographic data that may be appropriate for rational basis review is inappropriate here. See *Johnson* v. *California, supra* at 512.

Applying the strict scrutiny standard, as we must, I conclude that male and female prisoners are similarly situated for purposes of "major" disciplinary sanctions, and the department must therefore establish that its policy of enforcing its gender-neutral code of prison discipline in a sex-specific manner serves "a compelling interest" and "is limited as narrowly as possible consistent with its proper purpose." *Commonwealth* v. *Chou*, 433 Mass. 229, 237 n.6 (2001), quoting *Lowell* v. *Kowlaski*, 380 Mass. 663, 666 (1980). See *Attorney Gen*. v. *Massachusetts Interscholastic Athletic Ass'n*, 378 Mass. 342, 354 (1979), citing *Commonwealth* v. *King, supra* at 28 (actions must further demonstrably compelling interest, and means employed must be narrowly tailored, consistent with legitimate purpose).

In holding that DuPont's claim cannot survive the threshold "similarly situated" inquiry, the court considers the prison demographic data offered by the commissioner in his second affidavit sufficient to prove that male and female inmates are *not* "similarly situated." See *ante* at 396-397. However, in reviewing equal protection claims through the lens of heightened scrutiny, courts are required to look beyond justifications of disparate government action purportedly based on objective data. Even where, as in the prison context, the defendant officials are given a wide range of discretion, the reviewing court must train a critical eye on attempts to treat groups differently by suspect classifications. See *Johnson* v. *California, supra* at 512 (deference shown to expertise of prison officials in matters of prison operations, but Court will apply strict scrutiny to official policies

based on suspect classifications).[6] Government officials may not use a suspect classification as a "proxy" for individual characteristics or behavior. *Id.* at 511. Courts are required to take a "hard look" at official distinctions among groups based on their supposedly inherent differences. *United States* v. *Virginia,* 518 U.S. 515, 541 (1996) (applying intermediate scrutiny to Federal equal protection claims of females excluded from all-male Virginia Military Institute). Overly broad generalizations about "the way women are," *id.* at 550, or "the way men are," or based on the number of men housed together who may have committed violent crimes, may not serve as the basis to impose special burdens or award special benefits to individual men and women whose actions fall outside the presumed, sex-typed norm.[7] *Id.* The question is not whether DuPont is a bad actor in a bad environment, and "female prisoners" as a group are better people in a better environment, see *ante* at 398, but whether DuPont and *any* female prisoner who committed the same major offense as he

---

[6]The defendants' brief makes no mention of *Johnson* v. *California,* 543 U.S. 499 (2005), which held that an unwritten prison policy of separating new and transferring prisoners by race violated the equal protection guarantees of the Fourteenth Amendment to the United States Constitution. Perhaps this is because in that case all of the male inmates were held in the same maximum security prison, and were separated from one another under a nonfacially neutral regulation solely on the basis of their race. *Id.* at 502-503. Here, the regulation is facially neutral, and there is no challenge from DuPont that the separation of men and women into different prisons is impermissible even under a strict scrutiny standard. See G. L. c. 127, § 20. However, the defendants' reliance on *Turner* v. *Safley,* 482 U.S. 78 (1987), and their argument that rational-basis scrutiny, with its highly deferential standard of review, should apply to DuPont's claims is misplaced. In *Johnson* v. *California, supra,* the Supreme Court explicitly rejected the premise that the *Turner* case was applicable to cases involving suspect classifications. (*"Turner* is too lenient a standard to ferret out invidious uses of race"). At least in this Commonwealth, where gender classifications (like race classifications in the Federal system) are subject to strict scrutiny, prison cases involving gender classifications should be viewed under the standard of *Johnson* v. *California, supra* at 513, and not under the standard of *Turner* v. *Safley, supra.* See *Commonwealth* v. *King,* 374 Mass. 5, 21 (1977).

[7]I recognize that, for purposes of equal protection analysis, courts must distinguish between government action that burdens an already disfavored class and government action intended "to hasten the day when entrenched discrimination and its aftereffects have been extirpated." *Gratz* v. *Bollinger,* 539 U.S. 244, 301 (2003) (Ginsburg, J., dissenting). See *Brackett* v. *Civil Serv. Comm'n,* 447 Mass. 233, 251-252 (2006). The point requires no further development here, where DuPont's equal protection claim is moot. See *infra.*

did, thereby threatening public safety and prison security, are similarly situated for purposes of these severe disciplinary sanctions.

As noted earlier, the different treatment of male and female prisoners who commit major disciplinary offenses is stark. The male offender who, for example, stabs another inmate, faces the possibility of up to ten years in the department disciplinary unit (DDU), an especially harsh form of incarceration.[8] The female prisoner who stabs a fellow inmate, on the other hand, in all likelihood will serve a maximum of thirty days in solitary confinement. The reason for the vast disparity in punishments for the same obviously brutal and disruptive behavior is not apparent, if gender is not the major or determining criterion for the differing sanctions. Either the stabbing of a fellow inmate is a "major" disciplinary offense or it is not. If it *is* a major disciplinary offense, the security of the prison is at risk, see notes 2 and 3, *supra*, and sanctions should be levied on both women and men with something approaching far greater uniformity, as the gender-neutral written disciplinary regulations require. See 103 Code Mass. Regs. § 430.25(3). Generalizations about women's less aggressive nature,[9] comparative data about types of convictions for which men and women are

---

[8]In earlier litigation we observed that inmates in the DDU are permitted only three showers weekly and five hours of outdoor exercise weekly, weather permitting. For the remainder of the week, they are confined to a seven by twelve foot, minimally furnished cell, and their contact with the outside world may be severely limited. See *Torres* v. *Commissioner of Correction*, 427 Mass. 611, 613, cert denied., 525 U.S. 1017 (1998). See also note 4, *supra*, describing DuPont's severe conditions of confinement in the DDU, which are not challenged by the department.

[9]Although the commissioner points to women's supposedly less aggressive nature to justify his differential enforcement of gender-neutral disciplinary sanctions, he has also conceded that at least some women have committed disciplinary infractions serious enough to warrant their transfer to maximum security facilities out of State. See *ante* at note 22. The commissioner does not disclose for how long or under what conditions such female prisoners are confined. To the extent that the female prisoners are transferred for purposes of administrative convenience rather than placed in a DDU for women, administrative convenience without more is not a proper ground to justify gender-based differential treatment. Cf. *Stanley* v. *Illinois*, 405 U.S. 645, 656 (1972) (applying intermediate scrutiny to gender-based equal protection claim). It is also clear from the commissioner's affidavit that not all DDUs need necessarily be housed in maximum security facilities.

imprisoned, the length of their respective sentences, the number of major disciplinary infractions per penal institution, or even prison gang violence do not speak to the reality that individual female and male prisoners may and do act in similarly violent and dangerous ways. Faced with a constitutional challenge to the marked disparity of sanctions between genders, the sex-specific general data submitted by the commissioner are "immediately suspect," *Johnson* v. *California, supra* at 509, raising many more relevant questions than they settle. Rooting out improper motives in the sex-based classification of prisoners "bolsters the legitimacy of the entire criminal justice system." *Id.* at 511. It is a goal wholly compatible with the orderly, effective administration of prisons. *Id.* at 510.

The Legislature could not enact a law providing enhanced penalties for male but not female serial killers on the grounds that women are as a rule less violent than men and commit fewer serial murders, and thus the groups are not substantially similar. Cf. *Commonwealth* v. *King,* 374 Mass. 5, 19-22 (1977) (law criminalizing female but not male prostitution offends equal protection guarantees of the Massachusetts Constitution). The same strict scrutiny rationale forbids the department from imposing a far greater punishment on a male inmate than would be incurred by a female inmate who commits the same offense. The department should not have been awarded summary judgment predicated on a lack of substantial similarity between the classifications challenged.

A conclusion that strict scrutiny applies to DuPont's equal protection claim would not of itself be dispositive; ordinarily it would require remand to the trial court on the merits unless the summary judgment record established beyond dispute that both prongs of the analysis required in strict scrutiny cases, see *Commonwealth* v. *Chou,* 423 Mass. 229, 238 (2001), is without factual dispute. The first prong of the strict scrutiny test, that the department demonstrate a compelling interest, is not difficult for the department to surmount: the "compelling" nature of the need of prison officials and the public for orderly and secure prison administration is obvious. See, e.g., *Rasheed* v. *Commissioner of Correction,* 446 Mass. 463, 473-474 (2006), citing *Cutter* v. *Wilkinson,* 544 U.S. 709, 722-723 (2005) ("It cannot be doubted that the department has a compelling interest

in ensuring the safety of its staff and its inmates and the integrity of its institutions"). In my judgment, the department has met that burden here. I do not believe, however, that on the record submitted in support of summary judgment, the department has met its burden on the second prong: establishing beyond factual dispute that the challenged policy is "narrowly tailored" to its purpose. In different circumstances than pertain here (DuPont has been released), that question would be resolved at trial.

It is possible that at a trial, the department could prove that it has met the narrow tailoring required of strict scrutiny. It is, for example, within the authority of the commissioner to isolate inmates who, even after being assigned to a maximum security facility, continue to engage in violent or recalcitrant behavior toward either staff or fellow inmates. The commissioner may be able to prove that the operation of the DDU at Massachusetts Correctional Institution at Cedar Junction is not only "consistent with correctional institution management of a maximum security prison," as he states in his second affidavit, but that lengthy terms of severe isolation for those who commit "major" disciplinary offenses are the only effective way (i.e., the most "narrowly tailored" way) to provide a safe and secure correctional environment for other inmates, correctional staff, and the public in a maximum security prison. The high concentration of particularly dangerous prisoners in a single location may require the commissioner to implement such security measures concomitant with controlling such an environment. But such claims must be subjected to greater scrutiny than a grant of summary judgment on the basis of the commissioner's conclusory affidavits permits. I am not convinced on the record before us that the commissioner is unable to avail himself of more limited means to ensure prison safety than by disciplining male prisoners with disciplinary problems and female prisoners who commit the same type and number of disciplinary offenses in such grossly different ways.

In this case, DuPont has been released from incarceration. Any inquiries into the merits, including those pertaining to the narrowly tailored prong of the strict scrutiny test, are therefore

moot.[10] The department is entitled for that reason alone to summary judgment as a matter of law. See *Acting Supt. of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000), quoting *Attorney Gen.* v. *Commissioner of Ins.*, 403 Mass. 370, 380 (1988). ("Litigation ordinarily is considered moot when the party claiming to be aggrieved ceases to have a personal stake in its outcome").

---

[10]DuPont's complaint requested, among other things, declaratory and injunctive relief, as well as damages under G. L. c. 93, § 102, on his equal protection claims. On appeal, he does not press the statutory claim.